IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

DERRICK LAMONT BOOTH                                                    PETITIONER
ADC #86775

5:15-cv-00295 JLH-JTK

WENDY KELLEY, *Director*,
Arkansas Department of Correction                                      RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Court Judge J. Leon Holmes.  Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations.  The copy will be furnished to the opposing party.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendations and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District

Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## DISPOSITION

A Pulaski County Circuit Court jury found Petitioner, Derrick Booth, guilty of arson.  He filed a timely petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, and on January 25, 2016, the undersigned issued a partial recommendation to the District Judge that Booth's first, third, and fourth claims be denied; that his second claim be partially denied; and that, pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), an evidentiary hearing be held on the remaining ineffective assistance of counsel arguments made in the second claim.  (Doc. No. 31).

On February 23, 2016, the District Judge adopted in part and remanded in part the  partial recommendation.  Specifically, the District Judge declined to accept the portion of the proposed findings and recommended partial disposition that concluded Booth's trial counsel was not ineffective in his cross-examination of Fire Marshal Baker on issues pertaining to the source and origin  of the fire.  Therefore, the District Judge ordered that the evidentiary hearing also include review of that claim. (Doc No. 37) Subsequently, on February 24, 2016, the undersigned set for hearing on May 25, 2016, the following ineffective assistance of trial counsel claims: (1) failure to impeach Fire Marshal Baker on (a) his qualifications and (b) the method he used to determine the

source and origin of the fire; and (2) failure to challenge the State's forensic evidence of arson. (Doc. No. 38)

The evidentiary hearing took place on June 1, 2016, and the parties subsequently filed their post-hearing briefs.  (Doc. Nos. 59, 70, 71) The remaining issues are now ready for decision.  Based on the evidence submitted at the hearing and the post-hearing briefs of the parties, it is the undersigned's recommendation that the writ of habeas corpus be denied.

### Standard of Review under *Martinez v. Ryan*

"Errors of counsel made on post-conviction review that cause the default of other claims generally *cannot* serve as a basis for cause to excuse a petitioner's procedural default of his claims." *Workman v. Blades*, 2014 WL 4773953, at *9 (D. Idaho, Sept. 24, 2014) (citing *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)) (emphasis in original).  *Martinez v. Ryan*, *supra*, established a limited exception to the *Coleman* rule, when it held that "inadequate assistance of counsel 'at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.'" *Id.* (citing *Martinez*, 132 S. Ct. at 1315).  "In *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), the United States Supreme Court clarified that the *Martinez/Coleman* 'cause' test consists of four necessary prongs [outlined below].  The failure to meet any prong means that the *Martinez* exception is unavailable." *Id.* (citing *Martinez*, 132 S. Ct. at 1319).

Cause under *Martinez* is established where

(1) the claim of "ineffective assistance of trial counsel" is a substantial claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial -review collateral review proceeding."

3

*Trevino v. Thaler*, 133 S. Ct. at 1918 (citing *Martinez*, 132 S. Ct. at 1318-1319, 1320-1321) (alterations in original).

## Discussion

Given the standard outlined above, the undersigned has determined that the issues presented are adequate enough to excuse procedural default and explore them under *Strickland. See Workman*, 2014 WL 4773953, at *10 (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)) ("a court may conclude that a claim is substantial when a petitioner has shown that 'resolution' of the merits of the *Strickland* claim would be 'debatable among jurists of reason,' or that the issues presented are 'adequate to deserve encouragement to proceed further.'").

I.    <u>Testimony from Trial</u>

a.    Captain Naim Salaam

The State's first witness at trial was Captain Naim Salaam with the Little Rock Fire Department. Captain Salaam testified that he worked the fire at 3 Althia Circle on October 5, 2012. Petitioner's Exhibit 7, Vol. I, at 116-117.[1] He was the first person on scene, and he arrived shortly after 4:25 p.m. *Id.* at 130-131. When Captain Salaam did a walk-around of the home, he determined that the house looked secured, meaning the windows were down and the front and back doors were locked. *Id.* at 118. The firefighters made entrance into the home via the front door, located the fire in a bedroom, and extinguished it. *Id.* at 118-119. Once he entered the home and went into the bedroom where the fire was located, Captain Salaam found a bunch of clothing in a pile on the floor, and he determined that it was the location where the fire started. *Id.* at 122-123. He did not

---

[1]The Court refers to the page numbers in the upper right-hand corner of the page as opposed to the Bates-stamped numbers in the lower right-hand corner of each page.

find an ignition source close to the items burned. *Id.* at 124. Because Captain Salaam was unable to determine the ignition source, he had to get a fire marshal to the scene. *Id.* at 125-126.

b.      Captain Kevin Murphy

Captain Murphy with the Little Rock Fire Department testified the he also responded to a home fire at 3 Althia Circle on October 5, 2012. *Id.* at 140. He took the crew inside, searched for the fire, and extinguished it. *Id.* They located the fire in the front right room of the dwelling. *Id.* at 141. Prior to entrance, the firefighters knocked the window out to that room. When they entered the home, the firefighters found the door to the room closed. *Id.* The fire was behind the door, so Captain Murphy opened the door and had the crew come behind him to extinguish the fire once he opened the door to make the fire flame up when it caught air. *Id.* Captain Murphy noted that the home was in a ransacked state. *Id.* at 143. He exited the home and informed his commanding officer, Captain Salaam, what he saw. *Id.*

c.      Fire Marshal Ryan Baker

Baker testified that he had worked for the City of Little Rock Fire Department for a little over four years. *Id.* at 149. He had been in a fire marshal capacity since October 2011. Baker noted that his primary duty as a fire marshal was to investigate fires to determine the origin and cause. *Id.* He outlined his educational background and specialized training as follows. In 1997, Baker worked as a police officer and criminal investigator with the Fayetteville Police Department where he stayed for six years. In 2003, he moved to Sherwood and worked as a police officer and criminal investigator. While in Sherwood, he worked a fire case that peaked his interest in fires so he became a volunteer fireman with the Sherwood Fire Department, where he still worked. *Id.* at 150. Thereafter, he had a job opportunity with the bomb squad and moved to the Little Rock Fire

Department as a firefighter.  He was a post-blast investigator through the Federal Bureau of Investigations (FBI) and would go to bomb scenes whenever there had been an explosion and conduct investigations.  *Id.* at 151.  Because of his previous police experience, he was moved into the fire marshal division in October 2011. *Id.* at 150.  Since taking that post, he had worked 178 fire investigations at the time of Petitioner's trial in April 2013.  *Id.*

Baker had specialized training in fire cause and origin; he attended the state fire academy for several courses as well as the national fire academy for courses and on-the-job training.  At the time of trial, Baker was a fire investigation technician, but he was scheduled to test in the next couple of weeks to become a certified fire investigator through the International Association of Arson Investigators.  *Id.* at 151.

Given Baker's experience and training, the State moved to offer him as an expert in fire investigation and arson.  Defense counsel did not object.  *Id.*  Baker explained that there were four fire classifications or causes: natural, accidental, incendiary, and undetermined.  *Id.* at 152.  An incendiary fire was one caused by human involvement, and an undetermined fire was one where (1) there were either multiple sources of ignition and one specific source could not be identified, (2) there was a lack of an ignition source, or (3) there is a fire has fully developed and everything burns to the point where it is impossible to determine the source.  *Id.* at 152, 178.

Baker acknowledged investigating the fire at 3 Althia Circle on October 5, 2012.  *Id.* at 153.  He prepared an investigation report and ruled the fire to be incendiary.  *Id.* at 165.  Baker took two samples to the state crime lab in search for accelerants.  *Id.* at 168.  The results of that testing indicated that no ignitable liquids were detected.  *Id.* at 169.  Baker explained that, "just because it's an incendiary fire doesn't mean that we have to have accelerants. . . . So even though I did not have

6

an ignitable liquid in an incendiary fire, this actually tells me I did not have spontaneous combustion as well and ruling out that as a form of accidental fire." *Id.* at 170.

After conducting his investigation, Baker spoke to the homeowner, Mrs. Jacqueline Clark Booth, Petitioner's estranged wife. *Id.* at 167. Mrs. Booth shared a series of text messages from Petitioner with Baker. *Id.* at 171-172. Those messages included photographs from Petitioner to Mrs. Booth depicting the state of the house and messages that called Mrs. Booth some derogatory names. *Id.* at 171, 176-177. The State asked Baker if he was able to develop a suspect based upon his investigation, and Baker answered yes and then identified Petitioner. *Id.* at 172. Defense counsel did not object.

On cross-examination, the following colloquy took place between defense counsel and Fire Marshal Baker:

| | |
|---|---|
| DEFENSE COUNSEL: | Isn't this a classic example of an undetermined fire? |
| FIRE MARSHAL BAKER: | No, sir, it's not. |
| DEFENSE COUNSEL: | Why is it not? |
| FIRE MARSHAL BAKER: | Because any type of ignition source in this was removed from the scene. I alleviated all other types of ignition source in the area of my origin of my fire. The only other type of ignition source could be one that was taken away from the scene. |
| DEFENSE COUNSEL: | Excuse me? You're certain that they were removed from the scene? |
| FIRE MARSHAL BAKER: | Yes, sir, they were. |
| DEFENSE COUNSEL: | What is your basis for determining that? |
| FIRE MARSHAL BAKER: | They were not found in the area of origin. |

. . .

7

DEFENSE COUNSEL:            Now, this is a report from the Arkansas crime Lab that was
                           sent to you; is that correct?
                                       . . .
                              Read what the results of this examination are?

FIRE MARSHAL BAKER:        "No ignitible liquids were detected in ERB 1 or ERB 2.
                           Ignitible liquids may evaporate or be totally consumed during
                           a fire. A negative result does not preclude the presence of a
                           ignitable liquid during a fire."

DEFENSE COUNSEL:           And this [refers] to ignitable liquids?

FIRE MARSHAL BAKER:        That's what the test was for.

DEFENSE COUNSEL:           Were there any determinations from the crime lab as to
                           something that could have been removed?

FIRE MARSHAL BAKER:        I don't understand your question, sir.

DEFENSE COUNSEL:           You just said that the ignitable sources were removed? How
                           do you base that if you have a crime lab such as the one we
                           have here, crime lab report.

FIRE MARSHAL BAKER:        Are you referring to the ignition source was removed?

DEFENSE COUNSEL:           Ignition source or ignitable - - no ignitable liquids were
                           detected in item ERB 1 or ERB 2; is that correct?

FIRE MARSHAL BAKER:        Correct.

DEFENSE COUNSEL:           So what are you saying was removed that was the ignitable
                           source?

FIRE MARSHAL BAKER:        My competent - - my competent ignition source.

DEFENSE COUNSEL:           Your competent ignition source?
                                       . . .
                           And what could that be?

FIRE MARSHAL BAKER:        That could be matches.  That could be a lighter.

                                       . . .

DEFENSE COUNSEL:           Now,  you  indicated  part  of  the  reason  you  made  a

8

|                     | determination that Booth should be charged was because of text messages? |
|---------------------|---|
| FIRE MARSHAL BAKER: | Yes, sir. |
| DEFENSE COUNSEL: | Is there anything anyplace in the text messages you read where Derrick Booth said he was going to burn anyplace down? |
| FIRE MARSHAL BAKER: | I would have to look through it again, sir, but I don't believe so. |
| DEFENSE COUNSEL: | Did he say in that text message that he was going to do any bodily harm to Jacqueline Clark Booth? |
| FIRE MARSHAL BAKER: | I don't believe so, sir. |
| DEFENSE COUNSEL: | So to your knowledge, Mr. Booth never threatened to do her any bodily harm, did he? |
| FIRE MARSHAL BAKER: | Not to my knowledge other than Ms. Booth giving me a statement saying why she had left the residence earlier the day before. |
| DEFENSE COUNSEL: | And who did she leave that residence with? |
| FIRE MARSHAL BAKER: | She stated that she was escorted there by the Little Rock Police Department in order to get some belongings and leave in fear that Mr. Booth would hurt her. |
| DEFENSE COUNSEL: | So if Mr. Booth had threatened her, she had an opportunity to turn to a Little Rock police officer who escorted her there and tell the police officer that he had threatened her; is that correct? |
| FIRE MARSHAL BAKER: | She had the opportunity, yeah.  I'm not sure if she did or not. |
| DEFENSE COUNSEL: | Now, do you have any knowledge that he has ever hit her or laid his hands on her in any violent way? |
| FIRE MARSHAL BAKER: | No, sir, I do not. |

. . .

9

| | |
|---|---|
| DEFENSE COUNSEL: | Did you see any other traces of an attempt to set a fire? |
| FIRE MARSHAL BAKER: | No, sir, I did not. |
| DEFENSE COUNSEL: | So you're suggesting to the jurors that Derrick Booth intended to set something on fire but he wanted it restricted to one room? |
| FIRE MARSHAL BAKER: | I do not know what his intentions were when he set the fire, sir. |
| DEFENSE COUNSEL: | Thank you. |

*Id.* at 179- 189.

II.   Testimony from Evidentiary Hearing

a.   Robert Paul Bieber

Petitioner's habeas counsel called Robert Paul Bieber as an expert. Mr. Bieber started his public service career as a paramedic and then a firefighter. DE # 62 at 7. He gained certification as a fire and explosion investigator from the National Association of Fire Investigators. Subsequently, Bieber worked for an independent forensic engineering firm where he conducted origin and cause investigations, primarily for insurance companies. *Id.* at 8. During that time, he completed his bachelor's degree in criminal justice and went to work for the State of California Department of Insurance as a criminal fraud investigator but later went back part-time as a fire investigator with the engineering firm while also working part-time as a deputy coroner. *Id.* In 2010, Mr. Bieber became involved with post-conviction arson review with the Northern California Innocence Project. *Id.* Work with the Innocence Project later led him to found and direct the Arson Research Project, where with the assistance of an advisory board, he examines the reliability of evidence used in the investigation and prosecution of arson. *Id.* In this capacity, Mr. Bieber has also consulted, reviewed, and served as a private, independent fire investigator conducting case review

10

for defense attorneys handling fire cases across the country.  *Id.* at 9.

Mr. Bieber was contacted by habeas counsel to review the case documents in this matter, which included the fire investigation report of Fire Marshal Baker, the trial testimony, and the expert witness testimony involved herein.  *Id.* at 10.  According to Mr. Bieber, the National Academy of Science published a report in 2009 that tried to evaluate the strengths and weaknesses of a variety of forensic sciences, including fire investigation—although not the focus of the report. *Id.* at 11; *see also* Petitioner's Ex. 11.  According to Bieber, the report was significant in that it recognized that "sometimes the scientific underpinnings of various forensic disciplines are not quite as strong as you might be led to believe." *Id.*  Bieber noted that the report identified two core thresholds to consider: (1) was the testimony and the conclusions that the expert testified to based on solid scientific and reliable methodology and (2) how much of the analysis was based on human interpretation.  *Id.* at 11-12.

The National Fire Protection Association (NFPA) published a guidebook called the GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS, also known as NFPA 921, to aid fire investigators on how to conduct an investigation.  The guide is updated and revised every few years, and although some small and large changes have been made, Bieber notes that the one thing that has stayed the same is the connection between fire investigation and the scientific method.  *Id.* at 12-15.  Bieber noted that NFPA 921 is widely accepted as the premier guide that fire investigators use in determining the origin and cause of a fire.  *Id.* at 16.  He states that fire investigation conclusions need to be based on empirical evidence or physical evidence — evidence that can be observed or measured or that can be verified and known to be true.  *Id.* at 24.  Bieber noted that, while witness statements are legitimate to form working hypothesis concerning the circumstances surrounding a

fire, they do not form the basis for an expert to base his /her opinion upon. *Id.* The NFPA 921 does not mention witness statements in the chapter related to cause of a fire and are "only mentioned in the origin determination as far as being a legitimate source of information." *Id.* at 25.

From his review of the case file in this matter, Bieber determined that Fire Marshal Baker's investigation was completely reliable and reasonable as to the origin of the fire because it was based on a reasonable amount of quality and quantity of physical and empirical evidence. *Id.* Bieber did not agree with Fire Marshal Baker's conclusion as to the ignition source of the fire (open flame) because there was no physical or empirical evidence to support it. *Id.* Bieber could not say that an open flame did not start the fire—only that, he believed Fire Marshal Baker applied the negative corpus methodology, which is, "if you don't know what started it, then it must have been an open flame." *Id.* at 26. It is Bieber's opinion that such a conclusion did not comply with NFPA 921, was a violation of the scientific method, and was not based upon the application of scientific and technical principles sufficient to render a reasonable conclusion. *Id.* at 26-27. According to Bieber, because Fire Marshal Baker was unable to determine an ignition source, the more reasonable conclusion in conformance with NFPA 921's scientific method would be to conclude that the fire was undetermined. *Id.* at 27. Bieber testified that it was a violation of the scientific method and NFPA 921 for a fire marshal to testify as to the ignition source of a fire in the absence of any physical or empirical evidence to support it. *Id.* a 28. He concluded that Fire Marshal Baker's testimony that the ignition source of this fire could have been a match or lighter did not rise to the "threshold of confidence required by NFPA 921, and [had] the potential of misleading the jury into believing that, as an expert fire investigator, he has determined that it was an open flame that could have been a match or a lighter." *Id.* at 30.

12

Bieber testified that:

> Let me just be clear.  All of those steps that Investigator Baker took were completely reasonable and he was conducting a thorough criminal investigation.  With the exception of his ignition source conclusion, I think he conducted a thorough forensic examination.  Had they been separate investigations so that his final conclusions regarding the forensic science, his expert conclusions, would have been based only on the fire scene examination, we would have no controversy here.  But by doing both, the information from the criminal investigation  - - which he had to collect because he's doing a thorough criminal investigation - - it can't help but to influence his final conclusions.   And frankly, I think that's how the negative corpus methodology allows the fire investigator to conclude whatever - - because they are making a conclusion on a lack of physical evidence, they can make any conclusion they want. And whether they choose an open flame, which they then further associate with an intentional fire, or they say: Oh, it's just undetermined, often has its roots in this outside information in how it influences a conclusion.
>
> So perhaps had Investigator Baker not been aware of any of these outside circumstances that would make someone concerned or suspicious that Mr. Booth was involved in the fire, maybe he would have looked at that lack of physical evidence of the ignition source and said: The cause is undetermined.
>
> . . .
>
> The problem that happened in this case, frankly, and in many cases, is that he was asked to go beyond his expertise in origin and cause determination and asked to classify the fire as intentional or accidental, where you can only make that conclusion when considering - - first, that conclusion is not an expert conclusion for the reasons we discussed.  But it can only reasonably be made by examining the totality of the circumstances, all the information that he collected, not during his fire scene examination, but then it's presented to the jury as something that is based on science like his previous testimony was.

*Id.* at 30-45.

On cross-examination, Bieber testified that, like any other expert, fire investigators are entitled to base their opinion on their training and experience, which is not a deviation from NFPA 921.  According to NFPA 921, the goal of all investigators "is to arrive at accurate determinations related to the origin, cause, fire spread, and responsibility for the incident."  *Id.* at 56-57; *see also* Respondent's Ex. I, at 921-19.  He acknowledged that this goal was "a little wider-encompassing

than just fire investigation[.]" *Id.* at 57.  Bieber also acknowledged on cross examination that NFPA 921 states with regard to the cause of a fire that, in some instances, "a single item, such as an irrefutable article of physical evidence or a credible eye witness to the ignition, or a video recording, may be the basis of determination of cause," and also that "recording the scene, note taking, photography, evidence identification, witness interviews, origin investigation, failure analysis, and other data collection activities may be performed simultaneously with these efforts." *Id.* at 59-60; *see also* Petitioner's Exhibit 1, at 921-170.  This testimony refuted Bieber's earlier testimony on direct that witnesses were not mentioned when determining the cause of a fire under NFPA 921.

b.     Marion Andrew Humphrey, Sr.

Trial counsel, Marion Humphrey, also testified at the evidentiary hearing.  Mr. Humphrey testified that he was a retired Pulaski County Circuit Court Judge where he served for over eighteen (18) years.  DE #62, at 82.  Humphrey came to be involved in the case after his friend and Petitioner's stepfather asked Humphrey to represent Petitioner.  *Id.*

In preparation for this case, Humphrey acknowledged that he did not consider getting an expert.  He spoke with individuals in an effort to pinpoint Petitioner's location in order to exclude him as a possible suspect.  *Id.* at 90-91.  After reviewing the fire report, Humphrey also spoke with a church member who was a firefighter.  *Id.* at 90.  Mr. Humphrey did not show the church member the report, but Humphrey talked to him on the telephone about the use of the terminology contained therein.  *Id.* at 92-93. Humphrey identified several trial strategies that were weighed for benefits and risks.  Some of those strategies were eliminated due to the potential risk.  *Id.* at 99-100.  The intended trial strategy was to "poke holes" in some of the State's evidence that would create sufficient reasonable doubt as to Petitioner's involvement.  *Id.* at 91.  He also sought to (1) question

14

what motive Petitioner had to cause this fire and (2) show opportunity of others to cause the fire, including Jacqueline Clark Booth.  *Id.* at 95-96.  Humphrey determined that Petitioner undermined the latter strategy because, when Petitioner took the stand, he did not implicate her.  *Id.* at 96-97.

Humphrey did not feel as if Fire Marshal Baker's report was sufficient to establish that the fire was of a specific cause and determination.  *Id.* at 93.  He acknowledged that he had to be sensitive to attacking Fire Marshal Baker's credibility because "a lot of people think very highly of a fire department. And you have to be sensitive to that in trying to attack their credibility."  *Id.* at 101.  So instead, Humphrey sought to challenge Baker's determination that the fire was incendiary in nature as opposed to undetermined.  *Id.* at 93-95.  Humphrey sought to attack Fire Marshal Baker's conclusions from a common sense perspective and did not do any investigation into forensic fire investigation—a decision he admits that was not as informed as it could have been.  *Id.* at 103-105.  He did not question Baker's credentials, did not do any real study into fire investigation, and did not consult his own expert.  *Id.* at 104-106.  Humphrey stated that he thought the fire should have been undetermined and admits that he "dropped the ball" on consulting an expert that may have been able to bolster that conclusion.  *Id.* at 110-112.  Even with an expert, however, Humphrey testified that he was not sure he would have put the expert on the stand if he or she could not conclusively eliminate Petitioner or any person.  His reasoning was because it would have still left his client in the realm of possible suspects—especially given the vulgar texts Petitioner sent  to Jacqueline Clark Booth and the other relevant evidence, like the broken glass table that Petitioner admittedly broke—evidence that a jury could have used to find Petitioner as someone angry, out of control and subject to do something destructive.  *Id.* at 112-114.  Humphrey admitted that, by not studying or consulting with an expert, he was limited in terms of what he could expect for a defense

strategy.  *Id.* at 113-114.

III.    <u>Ineffective Assistance of Counsel Claims</u>

a.  Qualifications

Petitioner claims trial counsel was ineffective for his failure to (1) impeach Fire Marshal

Baker on (a) his qualifications and (b) the method he used to determine the source and origin of the

fire and (2) challenge the State's forensic evidence of arson.

According to Petitioner, because Fire Marshal Baker was the only witness who testified that

Petitioner intentionally set the fire to the home, failing to attack his qualifications and findings left

the jury with the misimpression that he was qualified to opine on the ultimate issue of the case.  DE

#71 at 4.  Petitioner asserts further that Fire Marshal Baker was not qualified to render his opinion

that he was the culprit of the fire.  *Id.* at 5.

The standard used to evaluate the admissibility of expert testimony is set forth in Rule 702

of the Federal Rules of Evidence.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods, and
> (3) the witness had applied the principles and methods reliably to the facts of the
> case.

Fed. R. Evid. 702.  *Daubert v. Dow Pharm.,* 509 U.S. 579 (1993) established that the Court has a

gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only

relevant, but reliable."  *Id.* at 589; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

To the extent Petitioner is complaining that Fire Marshal Baker lacked the requisite

qualifications sufficient for the Court to permit him to testify as an expert, that argument is

unavailing. Notably, Petitioner did not object to the State's offer of Fire Marshal Baker as an expert in fire investigations and arson, and it is unlikely that such an objection would have been successful anyway. *See* Petitioner's Exhibit 7, Vol. I, at 151; *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."); *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (Rule 702 "only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'") (internal citation omitted). Fire Marshal Baker was the person who investigated the crime at 3 Althia Circle. While he had only been in the position with the Little Rock Fire Department for approximately a year at the time of the fire, at the time of trial, he had been involved in 178 fire investigations in over a two-year period. *Id.* at 150. Along with on-the-job training, he had attended various courses and training from industry organizations in fire cause and origin. *Id.* This experience and training was sufficient to qualify Fire Marshal Baker to testify as an expert. To suggest otherwise in this instance the Court believes would "invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence." *United States v. Vesey*, 338 F.3d 913, 916-17 (8th Cir. 2003). "The relative skill or knowledge of an expert goes to the weight of that witness's testimony, not its admissibility." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 569 (8th Cir. 1988).

This testimony, however, is subject to some limitations. "Legal conclusions do not qualify as expert opinions." *Johnson v. Ball*, No. 4:13cv586 TIA, 2015 WL 1061564, at *2 (E.D. Mo. March 11, 2015) (citing *Jones v. Slay*, No. 4:12cv2109 CAS, 2014 WL 2804407, at *11 (E.D. Mo. June 20, 2014)). There are cases that allow a fire origin and cause expert to testify as to what they

found, where the fire started, and possible causes based on that evidence, but do not allow the expert

to go any further.  *See Weisgram v. Marley Co.*, 169 F.3d 514 (8th Cir. 1999) (allowing expert to

testify about burn and smoke patterns and other physical evidence but finding expert unqualified to

testify with respect to a possible heater malfunction).  In *United States v. Lundy*, 809 F.2d 392, 395-

396 (7th Cir. 1987), the Seventh Circuit suggested that an expert could not testify that a defendant

or anyone in particular caused a fire, although he/she could, based upon the results of the

investigation— which may have included hearsay and third-party observations—provide an expert

opinion as to whether a fire was natural, accidental, undetermined, or incendiary.  *See also United*

*States v. Peneaux*, 81 F.Supp.3d 764, 768 (S.D. Oct. 7, 2014).  Similarly in *Brandt Distrib. Co., Inc.*

*v. Federal Ins. Co.*, 247 F.3d 822, 825 (8th Cir. 2001), the Eighth Circuit held that a fire captain's

trial testimony that a fire was a "fraud fire" "set for fraudulent purposes" did not violate Rules 37

or 26 of the Federal Rule of Civil Procedure.  The Court noted that the captain's testimony did not

usurp the province of the jury because he gave no opinion as to who might have started the fire, and

"did not give an opinion as to who was responsible for the fire."  *Id.* at 826.

To the extent that Petitioner claims trial counsel was ineffective for failing to challenge Fire

Marshal Baker's testimony that, from his investigation, he was able to develop Petitioner as a

suspect, the undersigned disagrees.  It was Fire Marshal Baker's job to investigate this fire and make

a professional opinion as to its origin and cause.  He did not state on direct examination that

Petitioner caused this fire, which is a determination of guilt or innocence in criminal matters that is

within the exclusive province of the jury.  Instead, he merely noted that, based on his investigation,

he developed Petitioner as a suspect.  The undersigned recognizes that to some this may be a

distinction without a difference and that reasonable minds could differ.  *See Olesen v. Class*, 164

F.3d 1096, 1102 (8th Cir. 1999) (counsel's deficient performance in failing to object to the psychologist's testimony that L.S. would not fabricate a story involving sexual abuse did not render "the result of the trial unreliable or the proceeding fundamentally unfair," as is required before we set aside a conviction on ineffective assistance of counsel grounds.); *Cf. State v. Walters*, 120 Idaho 46, 813 P.2d 857 (2013) (trial counsel was ineffective when he failed to object to fire marshal's testimony that defendant started the fire). Nonetheless, the undersigned concludes that, even if one were to find cause, Petitioner cannot prove prejudice. The prejudice prong of *Strickland* focuses on whether counsel's performance rendered the trial unreliable or the proceedings unfair. *See Lockhart v. Fretwell*, 506 U.S. 364 (1993). In this instance, there was ample evidence from which the jury could conclude that Petitioner committed this crime.

      b.    Methodology

Petitioner's habeas counsel takes issue also with trial counsel's failure to challenge the methodology Fire Marshal Baker used to determine the source and origin of the fire. Her expert at the evidentiary hearing, Robert Bieber, testified that Baker deviated from the standard protocols of fire investigation contained in the NFPA 921. Bieber insisted that Fire Marshal Baker did not comply with NFPA 921 and that his conclusion that the fire was incendiary, absent the ability to determine an ignition source, was not based upon the application of scientific and technical principles sufficient to render a reasonable conclusion.

NFPA 921 was never mentioned at Petitioner's trial; therefore, the undersigned need not determine whether Fire Marshal Baker's methodology complied with NFPA 921. Even assuming Baker's analysis was inconsistent with NFPA 921, the failure of counsel to challenge Baker's non-use of NFPA 921 does not automatically render him ineffective. While NFPA 921 is widely

accepted as the standard guide in the field of fire investigation, it is not the only reliable method of fire investigation. *Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 845 (8th Cir. 2015) ("This court has qualified NFPA 921 as a reliable method endorsed by a professional organization for determining the cause of a fire.  Following NFPA 921 is not the only method of fire investigation that we have approved.  But if an expert purports to have followed NFPA 921, he must have followed it reliably, or his testimony may be excluded.") (internal citations omitted).  *See also Torske v. Bun-O-Matic Corp.*, No. A4-03-21, 2004 WL 1717649, at *5 (D. N. D. July 28, 2014) ("It is not readily apparent that a failure to strictly adhere to all NFPA guidelines renders an investigation incomplete or unreliable.  In addition, while these guidelines provide a legitimate criteria for evaluating an investigation, there is nothing before the Court to suggest they are exhaustive or exclusive."); *American Family Mut. Ins. Co. v. Hewlett-Packard Co.*, Civil No. 07-792 ADM/AJB, 2008 WL 2130217, at *4 (D. Minn. May 19, 2008) ("a failure to strictly adhere to NFPA 921 renders an investigation per se unreliable.  NFPA 921 is not the exclusive standard for investigating fire and explosion.").

Bieber believed that Fire Marshal Baker applied the negative corpus methodology, but regardless of whether negative corpus is approved by the NFPA 921, "the absence of an accidental explanation for a fire frequently has been cited as a sufficient basis for a finding of arson." *Somnis v. County Mut. Ins. Co.*, 840 F.Supp2d 1166, 1171 (D. Minn. 2012); *see also Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1257-1258 (8th Cir. 2006) (holding, without any reference to NFPA 921 that "[b]ased on the identification of a point of origin and the elimination of other possible causes, it is permissible for [the cause and origin expert] to testify as to the point of origin and to explain that he inferred through process of elimination that the PowerChair was the cause of

the fire").

Here, Baker reached his conclusion that the fire was incendiary based on his experience, his physical inspection of the property, interviews with Petitioner and his estranged wife, and information from the crime lab report.   Regardless of whether it was an NFPA 921 approved method, the undersigned finds that Baker's methodology was reliable.  *See Hickerson*, 470 F.3d at 1257 (holding that a cause and origin expert's methodology was reliable where he: (1) "examined burn patterns, examined heat, fire, and smoke damage, considered this evidence in light of testimony regarding the fire, and identified a point of origin'" (2) "then considered as possible causes of the fire those devices that contained or were connected to a power source and that were located at the identified point of origin"; and (3) eliminated as possible sources those devices that were not in the area of origin or that were not connected to a power source and contained no internal power source").   The decision not to follow the methodology set forth in NFPA 921, as well as other purported flaws in Baker's methodology, goes to the weight, not admissibility, of the evidence.  As such, the undersigned cannot say that Petitioner met his burden of showing counsel was ineffective for failing to object to Baker's methodology.  Even if the failure to object fell below an objective standard of reasonableness, Petitioner does not meet his burden under *Strickland* by showing prejudice.  At trial, counsel cross examined and challenged Fire Marshal Baker's conclusion that the fire was incendiary as opposed to undetermined.  *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)); *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 283 (8th Cir.

1995) ("Once the trial court has determined that a witness is competent to testify as an expert, challenges to the expert's skill or knowledge go to the weight to be accorded the expert testimony rather than to its admissibility.").

    c.      State's Forensic Evidence

Lastly, Petitioner argues that counsel was ineffective for his failure to make reasonable investigations to challenge the State's forensic evidence of arson. DE #71, at 20-21. Specifically, Petitioner asserts counsel did not do any scientific research or consult any experts to learn about fire investigation; he did not discuss the Fire Marshal's report with his fellow church-member who was a firefighter; and he was unfamiliar with the significance of NFPA 921. Therefore, it is Petitioner's contention that trial counsel was not in a position to make a strategic decision about how to challenge the State's evidence and did not know he could raise a *Daubert* challenge to the Fire Marshal's testimony or findings.

Petitioner uses *Jackson v. McQuiggin*, 553 Fed. Appx. 575 (6th Cir. 2014), as a comparison case. In *Jackson,* a petitioner convicted of arson argued that counsel was ineffective at trial because she opted to forgo expert testimony to refute the State's expert's theory that he used an accelerant to intentionally start a fire. Jackson and his girlfriend shared an apartment. In 2006, he allegedly set fire to the apartment using an accelerant. The day before the fire, he and his girlfriend had argued, and she attempted to leave. After convincing Jackson she would stay, the girlfriend later escaped to her mother's house. When Jackson found her, he smashed his truck into her mother's vehicle, and when she called the police, she was told about the fire at her residence. Jackson was charged with arson. "The circumstantial evidence against him was overwhelming. Jackson was the only person other than [the girlfriend] with a key to her apartment, he had previously threatened to

burn down the apartment, he had gone to a relative of [the girlfriend's] the day of the fire looking for a gun to 'kill [his] bitch,' and Jackson was the last person seen leaving the apartment shortly before the fire." *Id.* at 577. Jackson was subsequently convicted.

On his direct appeal, Jackson moved for a new trial, arguing that his trial lawyer failed to challenge the scientific validity of the fire marshal's conclusions concerning the cause and origin of the fire. The Michigan Court of Appeals remanded the case for an evidentiary hearing. Trial counsel and a fire expert testified at that hearing. Trial counsel testified that she thought an expert was unnecessary because (1) the prosecution could not prove that an accelerant had been used because neither the crime lab report nor the canine accelerant detection unit indicated the presence of an accelerant, and (2) she did not want to confuse the jury or needlessly distract them by presenting competing authorities. *Id.* In counsel's view, "juries tend to favor prosecution witnesses when experts testify." *Id.* at 578.

The expert testified but could not rule out arson. Instead, he argued the fire marshal deviated from the standard protocols for fire investigation contained in the NFPA 921. He noted there was no physical evidence to support the fire marshal's conclusion that the fire was started by an accelerant and charged that it was "possible" the fire started as a result of a pot left on the stove. *Id.*

Following the hearing, the trial court denied the motion for new trial, finding counsel's justifications for not obtaining a defense expert reasonable, and alternatively finding that, even if petitioner had employed a defense expert, the result would not have been different. *Id.* The Michigan Court of Appeals affirmed, and the Michigan Supreme Court denied review. On federal habeas appeal, the district court held trial counsel could have offered an expert witness but the

decision not to was reasonable given that the scientific evidence did not support arson.  The district court granted a certificate of appealability on trial counsel's ineffective assistance claim.  The Sixth Circuit affirmed the district court's denial of a writ, finding in part that (1) it was defensible for trial counsel not to present expert testimony as it might have confused the jury, undermined the defense's credibility, or biased the jury in favor of the prosecution's expert witness, and that (2) trial counsel adequately prepared and mounted a defense by (a) requesting a *Daubert* hearing, (b) seeking to attack the fire marshal report by showing he deviated from NFPA 921, (c) reading numerous articles about arson, studying resources from the Innocence Project on burn patterns, and reviewing NFPA 921 in anticipation of trial, (d) consulting several defense attorneys, one of whom represented a client charged with felony arson murder, (e) discussing with petitioner why foregoing expert testimony was prudent, and (f) eliciting important concessions from the fire marshal on cross-examination.  *Id.* at 580-582.

*Jackson* goes on to provide that "the range of reasonable applications is substantial when *Strickland* applies."  *Id.* at 583.  "When *Strickland* applies, as it does here, courts have 'more leeway . . in reaching outcomes in case-by-case determinations.'" *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Therefore, the Sixth Circuit did not second-guess the Michigan Supreme Court's determination that trial counsel was not ineffective for failing to call an arson expert based on the evidentiary record that memorialized counsel's articulated trial strategy.  Because decisions about challenging witnesses and evidence generally fall into the category of "strategic choices," courts "generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."  *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001).  As to challenges to the prosecution's witnesses, the "threshold of reasonable professional

competence required by *Strickland*," may be violated where counsel cannot articulate a reasoned strategy for failing to do something. *See United States v. Orr*, 636 F.3d 944, 953 (8th Cir. 2011). Strategic decisions made after thorough investigation are "virtually unchallengeable." *See Strickland*, 466 U.S. at 690. Courts must assess whether the investigation leading to a strategic decision "was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

With this in mind, the undersigned concludes that, even if trial counsel's strategy fell below an objective standard of reasonableness, Petitioner cannot show that counsel's errors were so serious that he was deprived of a fair trial. "There must be a 'substantial,' not simply 'conceivable,' chance of a different result." *Jackson*, 553 Fed. Appx. at 580. Trial counsel articulated a reasoned trial strategy wherein he acknowledged that he did not want to attack Fire Marshal Baker's qualifications because jurors thought highly of individuals at the fire department. He did, however, seek to attack the Fire Marshal's report in an attempt to cast some doubt that the fire was incendiary in nature. He further sought to establish that other people had access to the house and could have caused the fire.

This was indeed a circumstantial case. Petitioner's own expert at the evidentiary hearing could not rule out that the fire was not caused by arson. There was also testimony that Petitioner was at the home on that day, that he had been sending vulgar text messages to his estranged wife previously, and that he had sent text messages with photographs admitting that he had shattered the glass dining room table and overturned the dining room chairs. Evidence also suggested that he was the last person to have left the home before the fire. Trial counsel acknowledged that, even if he had consulted an expert, he might not have put him or her on the stand if Petitioner could not have been conclusively eliminated because, given the evidence, his client could have still been in the realm of possible suspects. The jury heard about the text messages, Petitioner's whereabouts on the day of

25

the fire, and counsel's cross-examination of Fire Marshal Baker wherein he questioned the cause of the fire in this instance.  While trial counsel certainly could have done more to strengthen his defense strategy, the undersigned cannot say that trial counsel's strategy was unreasonable given the circumstances.

### Conclusion

Based on the foregoing, the undersigned recommends that the instant writ of habeas corpus be denied and dismissed with prejudice.

### Certificate of Appealability

When entering a final order adverse to the Petitioner, the Court must issue or deny a certificate of appealability.  Rule 11 of the Rules Governing Section 2254 Cases in the United States District Court.  The Court can issue a certificate of appealability only if Petitioner has made a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). Because reasonable minds could differ on the issue of whether trial counsel was ineffective for failing to challenge Fire Marshal Baker's testimony that, from his investigation, he was able to develop Petitioner as a suspect, the Petitioner has provided a basis for issuing a certificate of appealability.

IT IS SO ORDERED this 21st day of December, 2016.

_____

UNITED STATES MAGISTRATE JUDGE